UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

RIK LINEBACK, Regional Director of          )
the Twenty-Fifth Region of the National     )
Labor Relations Board, for and on behalf    )
of the NATIONAL LABOR                       )
RELATIONS BOARD,                            )
                                            )
    Petitioner,                             )
                                            )
    v.                                      )   Case No. 1:14-CV-228 JD
                                            )
SMI/DIVISION OF DCX-CHOL                    )
ENTERPRISES, INC.,                          )
                                            )
    Respondent.                             )

## OPINION, ORDER, AND TEMPORARY INJUNCTION

This matter is before the Court on a petition by the Regional Director of the National

Labor Relations Board for a temporary injunction under section 10(j) of the National Labor

Relations Act. The Director alleges that the Respondent, SMI/Division of DCX-Chol

Enterprises, Inc., engaged in various unfair labor practices after it purchased the assets of a

previous employer whose employees were unionized, most notably by refusing to bargain with

the union after it became aware of a petition for decertification signed by over half of the

bargaining unit members. The matter is proceeding through the administrative process before the

Board, so the Director is seeking interim relief pending the conclusion of that process. For the

reasons that follow, the Court grants the petition in part and denies it in part, and issues an

injunction against the Respondent.

## I. FACTUAL BACKGROUND

In August 2013, DCX-Chol Enterprises, Inc. purchased all of the assets of Stuart

Manufacturing, Inc., a company located in Fort Wayne, Indiana that manufactures electronic

parts, wires, cables, and harnesses, mostly for the defense industry. For over thirty years, through various changes of ownership, Stuart Manufacturing's employees were unionized, and were represented by the Indiana Joint Board, Retail, Wholesale, Department Store Union, United Food & Commercial Workers, Local 835. The bargaining unit is defined as: "[A]ll full-time and regular part-time Production and Maintenance employees, but excluding Guards, Professional employees, Technical employees, Supervisors, and all other office employees at the Company's production facilities located in the City of Fort Wayne and County of Allen, Indiana." [DE 17-5 p. 4]. The collective bargaining agreement in effect at the time of the transfer had been executed in February 2011 and ran until February 2014. David Altman, President of the Indiana Joint Board, has represented the union members since 2000.

On August 19, 2013, shortly after the transaction took place, Gerald Pettit, Stuart Manufacturing's general manager, and Carol Goods-North, its director of human resources, held a meeting with Mr. Altman, and handed him a letter formally notifying him of the change in ownership. [DE 17-5 p. 34]. The letter stated that Lionel Tobin, Stuart Manufacturing's owner, would retain ownership of Stuart Manufacturing, but that DCX was purchasing all of its assets and would continue operations at the facility under the name "SMI – a Division of DCX." The letter further stated, "DCX understands that by purchasing the Stuart assets, they became a successor, therefore would request various modifications of the Bargaining Unit Agreement in order to effectively and successfully manage the operations at SMI." [*Id.*]

At the meeting, Ms. Goods-North stated that the only change she knew DCX would request of the Union was to change their pay date from every other Wednesday to the 5th and 20th of each month, to align the facility's pay periods with the rest of DCX. Mr. Altman said that he did not anticipate a problem with that request, but that he would need to submit it to the

bargaining unit for a vote. At a plant-wide meeting around the same time, Mr. Tobin and Neal Castleman, DCX's president, announced the transaction to the employees. They indicated that it would take some time to transition to new ownership, but they had few details to offer as to how the transition would affect the employees. Nonetheless, the facility continued its operations, and with the exception of Mr. Tobin, all of the employees at the facility continued on as employees of DCX.

On August 22, 2013, DCX and the Union held their monthly grievance meeting. Ms. Goods-North attended the meeting by phone, while Mr. Pettit and Mr. Altman were present in person. Following the meeting, Mr. Altman asked Mr. Pettit for permission to go to the employee break room to have a cup of coffee with the employees so that he could talk with them and answer any of their questions, as was his practice. During the seven years Mr. Goods-North had chaired the meetings, she had granted Mr. Altman's request every time, except for possibly one occasion. However, Mr. Pettit denied Mr. Altman's request. He said that the employees were busy and it would be disruptive for Mr. Altman to be in the break room. Mr. Pettit also later testified before the Administrative Law Judge that the company did not have a lot of information to give the employees about the change of ownership and transition, so he did not want them to be discussing the issue, which could lead to speculation and concern over their jobs. [DE 17-1 p. 87–88].

Around this same time, one of the bargaining unit employees began collecting signatures on a petition to decertify the Union. From August 21 to 23, 2013, twenty-nine members of the approximately fifty-four member bargaining unit signed the petition. [DE 17-4 p. 2]. Ms. Goods-North also stayed in contact with Mr. Altman relative to DCX's requested changes to the collective bargaining agreement. On August 29, 2013, Ms. Goods-North sent Mr. Altman an

email with the following proposal: "[DCX] accepts the existing contract with a minor change[][.] The Pay period changes fro[]m every other Wednesday to the 5th and the 20th of the month. As I mentioned before, the difference is merely 1 day. All the other Work Rules remain[] the same. If you can agree to this, I believe I can get the new owner to sign." [DE 17-3 p. 89]. Mr. Altman responded on September 3, 2013, by proposing having the employees vote by secret ballot in the break room, in order to expedite the process. Later that day, however, Ms. Goods-North responded that DCX was notified that a petition for decertification had been filed with the Board. She thus proposed waiting for the Board to act on that petition before moving forward, and Mr. Altman did not object. [DE 17-3 p. 90]. Accordingly, all of the terms and conditions of the employees' employment, including their pay dates, remained the same as they had been under Stuart Manufacturing.

Throughout this time, Mr. Tobin and DCX were exploring the possibility of having Stuart Manufacturing reopen its operations, apart from DCX, on a limited basis at the facility. Stuart Manufacturing was minority-owned and qualified as a "HUB zone" entity because it was located in an area targeted for economic development and employed a certain percentage of employees who lived in that area. These designations made Stuart Manufacturing eligible to perform work on certain contracts for the federal government because of incentives that were tied to those designations. DCX, however, did not meet either of those criteria, and would not be able to retain that component of Stuart Manufacturing's business. Mr. Tobin was therefore considering hiring back some of the employees and leasing a portion of the facility from DCX in order to service those contracts. DCX allowed Mr. Tobin to use his same office during this time, and with DCX's permission, Mr. Tobin spoke to about 15 of the employees to gauge their interest in accepting a job with this newly constituted version of Stuart Manufacturing.

During the monthly grievance meeting on October 16, 2013, Mr. Altman inquired of Ms. Goods-North about the plans to operate the two companies at the facility. Ms. Goods-North answered that they were still considering having both companies operate at the plant, and she confirmed that Mr. Tobin had spoken with several of the employees about accepting employment with his company. Mr. Altman then asked if both companies would operate under the same existing collective bargaining agreement. Ms. Goods-North stated that DCX would operate under the union contract. According to Mr. Altman, Ms. Goods-North also said that Mr. Tobin's company would not operate under the collective bargaining agreement because it would be non-union. DCX denies that Ms. Goods-North made this statement, though, and Ms. Goods-North testified that she never said there was a plan between DCX and Mr. Tobin to operate a non-union company at the facility.

Ultimately, the plan for Mr. Tobin to operate Stuart Manufacturing at the facility never came to fruition. Mr. Tobin and DCX encountered disagreements over their asset purchase agreement, and the parties have each retained counsel in the matter and may be heading towards litigation. That caused their relationship to sour, which put any plan for Mr. Tobin to lease DCX's facility and equipment to reopen Stuart Manufacturing on hold. Mr. Tobin did not ever hire any employees or lease any space or equipment from DCX, and he has not been to the facility in some time.

For the month of October 2013, the SMI Division shipped over $1 million of products in a single month. Mr. Castleman had set that mark as the facility's production goal after DCX acquired it, as he viewed that as the point at which the facility would be profitable, but the facility had not reached that mark in several years. As the end of the month neared, the managers realized that they were approaching the goal, so everyone at the facility made an extra effort to

reach the $1 million mark. Once they did so, Mr. Castleman wished to express his appreciation, so he directed Mr. Pettit to give every employee at the facility, from the janitor to the general manager, "a crisp $100 bill." [DE 17-1 p. 79, 81].  Mr. Pettit held a plant-wide meeting on November 4, 2013, to announce the award, and later that day, the managers handed each employee an envelope containing a $100 bill. All of the employees accepted the money. However, DCX never notified the Union of the award or bargained with it. Further, a Union membership meeting at which the employees were scheduled to elect their union officers was scheduled after the workday on November 4, 2013. After receiving the $100 bills, though, only three employees attended the meeting. This was a substantial decrease from the eight to fifteen employees who typically attended such meetings.

Since the collective bargaining agreement was set to expire on February 8, 2014, Mr. Altman and Ms. Goods-North began exchanging emails to initiate the bargaining process for a new agreement. By an email on November 25, 2013, Mr. Altman stated that the Union would like to meet with DCX as soon as possible in order to negotiate a new agreement. Mr. Altman and Ms. Goods-North arranged for the first bargaining session to take place on January 6, 2014. By this time, the Board had dismissed the employees' petition for decertification, but the employees refiled it on November 4, 2013. In addition, in December 2013, an employee anonymously left a copy of the decertification petition, containing signatures of over half of the bargaining unit employees, on Mr. Pettit's chair.

Upon receiving a copy of the petition, DCX began discussing the matter with its attorneys, and on January 3, 2014, on the eve of the parties' first scheduled bargaining session, counsel for DCX sent Mr. Altman a letter stating that DCX was no longer willing to bargain with the Union. Specifically, the letter stated:

At this time, DCX-CHOL is in possession of a document signed by a majority of the DCX-CHOL bargaining unit employees indicating that they do not wish to be represented by the Union going forward.

Importantly, we will honor the Collective Bargaining Agreement that is currently in effect as required by law. However, the mere fact that the Union has filed a blocking charge does not alter the fact that we are in possession of a document signed by a majority of the bargaining unit employees indicating that they do not wish to be represented by the R.W.D.S.U., Local 835. As such, we believe that we are legally obligated to honor that Petition and cannot negotiate for a contract that would cover a period of time within which the Union no longer represents the employees.

If you believe that we are in error in our legal analysis, please do not hesitate to provide us immediately law which suggest that we are in error. We would obviously review such information and reconsider our position. However, we believe that we are legally bound to honor the clear directive of the majority of the unit employees.

[DE 175-5 p. 36]. No bargaining has taken place between DCX and the Union since that time, even though the collective bargaining agreement has since expired. Thereafter, in April 2014, DCX changed the employees' pay dates from every other Wednesday to the 5th and 20th of each month, as it had proposed previously. It did not notify or bargain over the change with the Union, though.

Mr. Altman filed seven separate unfair labor practice charges against DCX relative to these events on behalf of the Union. The charges alleged that DCX violated the Act by denying Mr. Altman access to the break room, by stating that Mr. Tobin's company would operate at their facility non-union but with current union employees, by awarding $100 bonuses to each employee without bargaining over them, by refusing to bargain with the Union as the collective bargaining representative of the employees, and by unilaterally changing the employees' pay dates without bargaining with the Union, among other reasons. On April 30, 2014, the Director filed a consolidated complaint against DCX before the Board. An administrative law judge held a hearing on the matter on July 15 and 16, 2014, at which DCX and the Board were each

represented by counsel and presented witnesses and exhibits. In a decision dated September 23, 2014, the ALJ found in the Director's favor as to five of the seven charges—each of the charges described above. The ALJ ordered DCX to cease and desist from each of the unfair labor practices, and also ordered DCX to bargain with the Union as the exclusive collective-bargaining representative of the employees, among other relief.

On July 31, 2014, after the administrative hearing but before the ALJ issued his decision, the Director initiated this action by filing a petition for a temporary injunction against DCX. The petition seeks injunctive relief as to each of the seven charges pending the Board's final resolution of this matter, as it could still be some time before the Board reaches a final decision and is able to enforce its orders. The Director also moved to try this petition on the record made before the administrative law judge, which Magistrate Judge Cosbey granted without objection on September 5, 2014. This matter is now fully briefed, and both parties have also had the opportunity to address the effect of ALJ's decision on this matter.

## II.  STANDARD OF REVIEW

Section 10(j) of the National Labor Relations Act authorizes a district court to "order injunctive relief pending the Board's final disposition of an unfair labor practice claim if such relief would be 'just and proper.'" *Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566, 569 (7th Cir. 2011); 29 U.S.C. § 160(j). An injunction granted under § 10(j) is an "extraordinary remedy" and should only be granted in those situations in which effective enforcement of the Act is threatened by the delays inherent in the NLRB dispute resolution process. *Irving Ready-Mix*, 653 F.3d at 570; *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 500 (7th Cir. 2008).

The Director is entitled to interim relief when: (1) the Director has no adequate remedy at law; (2) the labor effort would face irreparable harm without interim relief, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction; (3) "public

harm" would occur in the absence of interim relief; and (4) the Director has a reasonable likelihood of prevailing on the merits of his complaint. *Spurlino Materials, LLC*, 546 F.3d at 500; *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 286 (7th Cir. 2001). The Director bears the burden of establishing the first, third, and fourth of these circumstances by a preponderance of the evidence. *Spurlino Materials, LLC*, 546 F.3d at 500.

As to the likelihood of prevailing on the merits, the fourth prong "does not ask the district court to pass on the merits of the underlying case; rather, the court evaluates only on a preliminary basis the Director's probability of success before the Board." *Irving Ready-Mix, Inc.*, 653 F.3d at 570. Specifically, it must be decided whether the Director has a "better than negligible" chance of success; whether the Director has "some chance" of succeeding on the merits. *Spurlino Materials, LLC*, 546 F.3d at 502 (7th Cir. 2008); *Francisco Foods, Inc.*, 276 F.3d at 289; *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1568 (7th Cir. 1996). In conducting this analysis, a district court may also consider the ALJ's decision:

> [T]he ALJ's decision . . is [] relevant to the propriety of section 10(j) relief. Assessing the Director's likelihood of success calls for a predictive judgment about what the Board is likely to do with the case. The ALJ is the Board's first-level decisionmaker. Having presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed.

*Francisco Foods*, 276 F.3d at 288, 300–01 (holding that the Director had a strong-likelihood of success on the merits, based, in large part, upon the ALJ's decision in favor of the Director). In addition, the strength of the Director's case on the merits affects this Court's prong-two assessment of the relative harms posed by the grant or denial of injunctive relief: the better the Director's case on the merits, the less compelling his showing of irreparable harm in the absence of an injunction must be. *Spurlino Materials, LLC*, 546 F.3d at 500; *Francisco Foods, Inc.*, 276

F.3d at 286–87; *Lineback v. Printpack, Inc.*, 979 F. Supp. 831, 839 (S.D. Ind. 1997) ("[A] strong showing by the Director of likely success on the merits can offset a weak showing of harm.").

## III.  DISCUSSION

In its opening brief, the Director cited seven separate unfair labor practices that it contends require interim injunctive relief. The ALJ subsequently found in the Director's favor as to five of those seven claims, so the Director withdrew its request for injunctive relief as to the other two. Thus, the alleged unfair labor practices that remain at issue are: (1) refusing to recognize and bargain with the Union; (2) unilaterally changing the employees' pay date in April 2014; (3) awarding a $100 bonus to all employees without bargaining with the Union; (4) denying a union official access to DCX's employee break room on August 22, 2013; and (5) stating that Stuart Manufacturing would be non-union. The Court addresses the propriety of injunctive relief as to each of these in turn.

### A.  Refusing to Recognize and Bargain with the Union

The central dispute in this matter is whether DCX was required to recognize and bargain with the Union despite the Union's loss of majority support among the employees, as indicated by the petition for decertification. In arguing that DCX committed an unfair labor practice in refusing to bargain with the Union, the Director primarily argues that DCX violated the "successor bar," given that DCX had become a successor to Stuart Manufacturing by purchasing its assets and taking over its operations. "A new employer is a successor to the old . . . when there is 'substantial continuity' between the two business operations and when a majority of the new company's employees had been employed by the predecessor." *UGL-UNICCO Serv. Co.*, 357 N.L.R.B. No. 76, at *1 (Aug. 26, 2011); *Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 43 (1987). In those circumstances, the successor employer is typically free to set its initial terms and conditions of employment unilaterally, prior to bargaining. *N.L.R.B. v. Burns*

*Int'l Sec. Servs., Inc.*, 406 U.S. 272 (1972). However, the employer is obligated thereafter to recognize and bargain with union. *Id.*

The Board has recognized that the uncertainty and destabilizing effects inherent in such circumstances may upset the existing collective-bargaining relationship, and that employees "'might be inclined to shun support for their former union'" where the successor can effectively undo what the union had worked to achieve for its members. *UGL-UNICCO*, 357 N.L.R.B. No. 76, at *8–9 (quoting *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 39 (1987)). In order to inject a degree of stability into that scenario, the Board in *UGL-UNICCO* re-adopted the successor bar doctrine. Under that doctrine, once an employer becomes a successor,

> the union is entitled to a reasonable period of bargaining, during which no question concerning representation that challenges its majority status may be raised through a petition for an election filed by employees, by the employer, or by a rival union; nor, during this period, may the employer unilaterally withdraw recognition from the union based on a claimed loss of majority support, whether arising before or during the period.

*UGL-UNICCO*, 357 N.L.R.B. No. 76, at *11. In other words, the successor bar "creates a *conclusive* presumption of majority support for a defined period of time, preventing any challenge to the union's status . . . ." *Id.* at *4. The Board has adopted a bright-line rule that, in cases such as this where the successor adopts the existing terms and conditions of employment, this bar runs for a period of 6 months, measured from the date of the first bargaining meeting between the union and the successor employer. *Id.* at *12.

Here, DCX acknowledged at the outset that it qualifies as a successor. Therefore, as the ALJ concluded, "the Union was entitled to a six month period of bargaining, during which [DCX] was precluded (under the successor bar) from unilaterally withdrawing recognition from the Union based on a claimed loss of majority support." [DE 19-1 p. 22]. However, DCX never participated in any bargaining sessions with the Union, and it expressly stated on January 3, 2014

that it would not bargain with the Union due to its loss of majority support. Under the successor bar, DCX was not permitted to refuse to bargain with the Union based on a claim of a lack of majority support, as the Union's majority support could not be challenged by anyone during this time. Therefore, the Director has a strong likelihood of establishing that DCX violated the successor bar and committed an unfair labor practice by refusing to bargain with the Union.

DCX attempts to distinguish *UGL-UNICCO* on the basis that it was in actual possession of a petition for decertification, whereas *UGL-UNICCO* involved a petition for representation by a rival union, but that distinction is immaterial—*UGL-UNICCO* expressly stated that the successor bar applies regardless of who files a petition challenging majority support for the incumbent union. 357 N.L.R.B. No. 76, at *11 (stating that the successor bar prohibits a challenge to the union's majority support "through a petition for an election *filed by employees, by the employer, or by a rival union*" (emphasis added)); *see id.* ("Perhaps the strongest argument against a 'successor bar' is the burden that it places on the Section 7 rights of employees, *particularly when the bar prevents employees from filing an election petition with the Board*." (emphasis added)). DCX also expresses its discomfort with negotiating with a Union that no longer had the support of a majority of its bargaining unit employees, but while that discomfort is understandable, it is legally irrelevant. *UGL-UNICCO* acknowledged and discussed at length the cost that the successor bar imposes on employee choice, but concluded that the stabilizing effects of the successor bar outweighed such concerns. Thus, the Court concludes that the Director has a high likelihood of success on the merits on this issue.

Turning to the equitable factors, the Court also finds that the Director has no adequate remedy at law; that the labor effort would face irreparable harm without interim relief and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction; and

that public harm would occur in the absence of interim relief. In the section 10(j) context, "the 'adequate remedy at law' inquiry is whether, in the absence of immediate relief, the harm flowing from the alleged violation cannot be prevented or fully rectified by the final Board order." *Harrell ex rel. NLRB v. Am. Red Cross*, 714 F.3d 553, 557 (7th Cir. 2013). Here, DCX is not bargaining with the Union, and the Board's eventual order will not be able to repair harm that the Union will have suffered by being unable to bargain on behalf of its employees between now and then. As the Seventh Circuit stated in *Spurlino Materials*, "[t]he longer that an employer is able to . . . avoid bargaining with a union, the less likely it is that the union will be able to organize and to represent employees effectively on the NLRB issues its final order." 546 F.3d at 500. Therefore, the Director has met its burden of establishing an inadequate remedy at law.

For similar reasons, the Union would face irreparable harm without interim relief. "[T]he same evidence that establishes the Director's likelihood of proving a violation on the NLRA may provide evidentiary support for a finding of irreparable harm," and "'the prospect of an irreparable harm may be inferred' from the nature of the violation of the Act." *Harrell*, 714 F.3d at 557. Where an employer fails to bargain with a union, "'[t]he deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable. That loss, combined with the likelihood that the Board's ability to rectify the harm is diminishing with time, equals a sufficient demonstration of irreparable harm to the collective bargaining process.'" *Spurlino Materials*, 546 F.3d at 501 (quoting *Electro-Voice*, 83 F.3d at 1573); *Francisco Foods*, 276 F.3d at 298–99 (noting that a "union finds itself 'in a peculiarly vulnerable position' in the transition from predecessor to successor," and that a delay in bargaining can cause irreparable harm). This harm to the labor effort outweighs any harm to DCX. While DCX must bargain in good faith with the Union, it need not agree to any particular term of condition of employment

13

for the employees, and its own distaste for bargaining with a union that its employees do not support does not outweigh the harm to the Union.

Finally, public harm would occur in the absence of interim relief. "[T]he public interest is furthered, in part, by ensuring that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Spurlino*, 546 F.3d at 502; *Francisco Foods*, 276 F.3d at 300 ("[T]he interest at stake in a section 10(j) proceeding is 'the public interest in the integrity of the collective bargaining process."). DCX's refusal to bargain with the Union during the pendency of the proceedings before the Board, which could take considerable time, would harm the public's interest in the integrity of the collective bargaining process, and DCX has not offered any argument on this element, so the Court finds that the Director has satisfied its burden on this issue as well.

Therefore, injunctive relief is appropriate in response to DCX's refusal to bargain with the Union. The Court will order DCX to recognize and, upon request, bargain with the Union as the exclusive collective-bargaining representative of the bargaining unit employees. In accordance with *UGL-UNICCO*, this obligation will commence immediately, and will last until at least 6 months after the date of the first collective bargaining meeting between the parties.

**B.      Unilaterally Changing the Employees' Pay Date**

The Director next argues that DCX committed an unfair labor practice by unilaterally changing the employees' pay date. Employees' wages, hours, and other terms and conditions of employment are mandatory subjects of bargaining, and an employer may not unilaterally change them without first notifying the union and giving the union an opportunity to bargain over those changes. Employees' paydays are among the terms and conditions of employment that are mandatory subjects of bargaining. *Abernathy Excavating, Inc.*, 313 N.L.R.B. 68, 69 (1993); *Am. Ambulance*, 255 N.L.R.B. 417, 421 (1981). Here, there is no dispute that DCX changed its

employees' pay dates from every other Wednesday to the 5th and 15th of every month, and that it did not bargain with the Union over the change. The ALJ also found in the Director's favor on this issue. DCX all but concedes that it was improper for it to have unilaterally changed the pay dates, and offers no substantive argument to the contrary, so the Court concludes that the Director is likely to succeed on the merits of this issue.

DCX's primary argument against injunctive relief for this violation is that the employees were not harmed by the change in their pay dates, as the interest for any delay in receiving their checks would measure in the pennies. The Court agrees that an injunction is inappropriate as to any monetary harm from this violation, as that aspect of the harm is likely minimal and can be fully redressed by the Board's eventual order, but that is only half the story. *See Harrell ex rel. NLRB v. Am. Red Cross*, 714 F.3d 553, 557 (7th Cir. 2013) (stating, in response to the employer's argument that the availability of back pay provides an adequate remedy at law, that the argument "incorrectly focuses solely on the individual workers, and ignores the damages flowing from the crippling of a new union, which transcends the loss of workers' pay"). Where an employer makes unilateral changes, it puts "the Union in the position of having to bargain back benefits and conditions of employment that its members would have already had in the absence of" those changes. *Id.* at 558.

In those circumstances, rescission of the unilateral changes to restore the status quo is an appropriate section 10(j) injunction. *Id.* (collecting "a long line of cases which support rescission to restore the status quo"). Leaving the unilateral change in place pending the Board's resolution of this matter would continue to leave the Union at a disadvantage relative to the status quo and could impair its bargaining position in the meantime. Granted, it is not clear here whether the pay dates were particularly important to the employees, such that they would be interested in

bargaining back for them. But changing the pay dates was important for DCX, so even if the employees were indifferent as to when they were paid, they may have been able to extract other value from DCX in return for their concession on this issue. DCX's unilateral change deprived them of that opportunity, thus establishing irreparable harm and an inadequate remedy at law. *Id.* Such changes also establish public harm by impairing the integrity of the bargaining process.

DCX relatedly argues that the Court should not rescind the change in pay dates because changing the pay dates back again may inconvenience the employees more than not doing so, and that the employees may prefer that the pay dates remain as they are. DCX is correct that that is a possibility. However, rather than denying relief altogether, the appropriate course in these circumstances is to condition the rescission on the employees' choice. *See, e.g.*, *Innovative Commc'ns Corp. v. N.L.R.B.*, 39 F. App'x 715, 718 (3d Cir. 2002) (affirming an order by the NLRB that conditioned rescission of the unilateral changes on the "affirmative desires of the [employees] as expressed through their bargaining representative"). Last, DCX argues that it will be harmed if it has to change the pay dates back, as it will have to pay its payroll contractor to process a separate pay date for the Fort Wayne facility only. However, DCX has not indicated how much that would cost it, so the Court cannot evaluate the extent of that harm. In addition, if DCX wants the entire company's payroll to be on the same schedule, it could do so by moving the rest of the company's pay dates to every other Wednesday instead of by moving the Fort Wayne facility's pay dates. Thus, the Court cannot conclude that the balance of harms favor DCX. Accordingly, the Court will enter an injunction requiring DCX to rescind the change in pay dates and move the union members' pay date back to every other Wednesday, should the employees request such rescission within 30 days of this Order.

C.    **Awarding a $100 Bonus without Bargaining with the Union**

The Director next argues that DCX committed an unfair labor practice by unilaterally awarding all of its employees, including the union members, a $100 bonus. DCX did not notify the Union or bargain with it over this award, so the Director contends that this constituted an improper unilateral change to the employees' wages, in violation of section 8(a)(1) and (a)(5) of the Act. While DCX acknowledges that it gave each of the employees the award without bargaining with the Union, it argues that the award was merely a gift, which is not a mandatory subject of bargaining, so that the award did not constitute an unfair labor practice.

The Second Circuit has summarized the standard for determining when awards constitute wages as opposed to gifts as follows:

> The question of whether an award constitutes wages and therefore is the subject of mandatory bargaining turns upon whether the award is "so tied to the remuneration which employees received for their work that [it was] in fact a part of it." *NLRB v. Niles-Bement-Pond Co.,* 199 F.2d 713, 714 (2d Cir.1952). In ascertaining whether a stock award is so tied to remuneration that it must be the subject of bargaining, the Board looks to the relationship of the award to other employment-related factors, including work performance, wages, hours worked, seniority, and production. *See Benchmark Indus.,* 270 N.L.R.B. at 22. An award that is sufficiently tied to these work-related factors is considered part of the overall compensation that an employee receives and is therefore mandatorily bargainable. For example, a bonus has been considered "employment-related" when it was tied to the company's profits, *Waxie Sanitary Supply,* 337 N.L.R.B. 303, 304 (2001), or when it was paid based on supervisory recommendations and work performance, *Radio Television Technical Sch., Inc. v. NLRB,* 488 F.2d 457, 460 (3d Cir.1973). An additional consideration in the analysis is the regularity with which similar awards or payments have been made in the past. Bonuses that are not tied to other employment-related factors have been found to be the subject of mandatory bargaining when they were "paid over a sufficient length of time to have become a reasonable expectation of the employees and, therefore, part of their anticipated remuneration." *NLRB v. Electro Vector, Inc.,* 539 F.2d 35, 37 (9th Cir.1976) (citation and internal quotation marks omitted); *accord United Shoe Mach. Corp.,* 96 N.L.R.B. 1309, 1314-15 (1951).

*Unite Here v. NLRB*, 546 F.3d 239, 243 (2d Cir. 2008) (affirming the Board's decision in *N. Am. Pipe Corp.*, 347 N.L.R.B. 836 (2006)).

Applying this standard, the ALJ found in the Director's favor and determined that the $100 award was a mandatory subject of bargaining. The ALJ reasoned that even though the award was given to all employees, regardless of their wages, hours worked, or seniority, the award was tied to a production goal, which in turn tied it to the employees' performance as well, and that DCX had promised additional bonuses if employees reached the production goal in the future. Thus, the ALJ found that the award constituted wages, and that DCX acted improperly by failing to bargain with the Union over the award.

The ALJ's conclusion is far from inevitable under these circumstances. The fact that the award was given to all employees without regard for their wages, hours, or seniority weighs against finding the award to be wages. *N. Am. Pipe*, 347 N.L.R.B. at 837–38. Further, although, as the ALJ noted, DCX's reason for giving the award was based on a production goal, the amount of the award was unaffected by any individual employees' production or performance— it was exactly the same for every employee. *Id.* at 838 (noting, in finding an award to be a gift, that "[t]he size of the award was established without regard to any employment-related factors, including work performance, wages, hours worked, seniority, or productivity," where every eligible employee "received the same amount of stock whether they were the highest paid managers or the lowest-paid hourly employees"). In addition, the fact that the award was given because the company reached a particular achievement is not itself dispositive. *Id.* (finding that an award of stock given because of the employer's successful IPO was a gift, not wages).

Nonetheless, the Court finds that the Director has established at least the minimum likelihood of success on the merits to meet its burden on this issue. DCX's reason for giving the award was to reward employees for having met a particular production standard, which points at least somewhat in favor of considering the award wages. In addition, unlike *Unite Here*, where

the award "was related to a one-time event—the parent corporation's IPO—with no promise of prospect of repetition," 347 N.L.R.B. at 838, Mr. Castleman stated that he would give this same award any time the facility reaches its $1 million per month production goal, which further supports the Director's position. Finally, although the ALJ's findings on this issue are not dispositive, they still inform the Court's inquiry, and the ALJ found in favor of the Director. It is possible that the Board will weigh these factors in a similar manner, so the Court concludes that the Director has a "better than negligible" chance of success, and has met its burden on this issue.

The Director seeks two forms of injunctive relief to address this alleged violation. The Director first seeks rescission of the unilateral change upon request from the Union.[1] However, the employees were not themselves harmed, irreparably or otherwise, by having received $100. And to the extent any employee believes that DCX should not have given them the money, it is already entirely within the employees' power to remedy that—the employees do not need permission from this Court in order to return the $100 to DCX. Rather, any harm from the bonus would have been sustained by the Union, but rescission would do nothing to cure that harm. In fact, if the problem with the bonus was that it tended to diminish employee support for the Union, it is hard to imagine what would further erode that support more than requiring, at the request of the Union, all of the union employees to return their bonuses. Finally, ordering rescission at the option of the employees would be useless, as the Director has offered no reason that any employee would exercise that option. To the contrary, all of the DCX employees who testified before the ALJ, including even its union leaders, believed that the bonus was wholly

---

[1] The ALJ did not order rescission, but ordered DCX to make the employees whole for any losses they incurred as a result of this unilateral change. The Court declines to consider such a remedy here, as the employees are already more than "whole," having each received a $100 bill.

proper and appreciated, so it is clear that they would not. Accordingly, the Court denies the Director's request in this respect.

The Director also requests an order prohibiting DCX from awarding such bonuses in the future, and its case for this form of injunctive relief is stronger. It is uncertain whether or when DCX will reach the $1 million per month production goal again, but Mr. Castleman stated that if it did, he would award the same bonuses, so there is some prospect that this alleged violation will recur. If it does, the Union could face irreparable harm, as the unilateral payments would circumvent the Union's bargaining role and could reduce the employees' incentive to support it. This harm may have already been felt to some extent, as the union meeting that took place immediately after the $100 bills were distributed, at which the employees were scheduled to elect their union officers, was attended by only three employees, a far lower turnout than normal. If this situation repeats, the harm could be particularly damaging given the Union's precarious situation in dealing with a successor employer and given that employee support for the Union may have further diminished during the time period in which DCX has failed to bargain with the Union. An eventual order from the Board would not necessarily cure this harm, as the Board cannot restore employee support that has dissipated, and a rescission or make-whole order would be inappropriate where the employer has only conferred benefits on the employees. Conversely, DCX would face almost zero harm through an injunction requiring it to bargain with the Union prior to awarding any further bonuses. Since all of the union members very much appreciated the bonuses, they will almost certainly approve them if offered in the future, so bargaining over the bonuses will likely have little effect on DCX.

Therefore, the Court finds that the Director has no adequate remedy at law to address future improper awards, that the labor effort would face irreparable harm without interim relief,

that such harm outweighs any harm posed to DCX, and that public harm would occur absent

interim relief. Accordingly, the Court will enjoin DCX from granting this or similar awards to

the bargaining unit employees in the future without first bargaining with the Union.

**D.      Denying Access to the Break Room**

The Director next argues that DCX improperly denied Mr. Altman access to its employee

break room following the August 22, 2013 grievance meeting, in violation of section 8(a)(1) and

(a)(5) of the Act. The Director contends that denying Mr. Altman access to the break room on

this occasion was an unfair labor practice because it constituted a unilateral change on a

mandatory subject of collective bargaining. While the CBA does not expressly require DCX to

permit union officials access to the break room following grievance meetings, the Director

asserts that DCX and its predecessor permitted such access so consistently that it became a term

and condition of employment.

"An employer's regular and longstanding practices that are neither random nor

intermittent become terms and conditions of employment even if these practices are not required

by a collective-bargaining agreement." *Prime Healthcare Servs.-Garden Grove, LLC*, 357

N.L.R.B. No. 63, at *8 (Aug. 26, 2011). "The party asserting the existence of a past practice

bears the burden of proof on the issue and the evidence must show that the practice occurred

with such regularity and frequency that employees could reasonably expect the practice to

continue or reoccur on a regular and consistent basis." *Palm Beach Metro Transp., LLC*, 357

N.L.R.B. No. 26, at *7 (July 26, 2011). Once the practice becomes a term or condition of

employment, the employer can only unilaterally change the practice if the change is not

"material, substantial, and significant." *Frontier Hotel & Casino*, 323 N.L.R.B. 815, 818 (1997);

*Palm Beach Metro Transp.*, 357 N.L.R.B. No. 26, at *7 ("An employer's duty to bargain only

arises, however, if the changes are material, substantial, and significant ones affecting terms and conditions of employment.").

The ALJ found that DCX and Stuart Manufacturing "had a seven-year past practice of allowing union representatives to access the employee break room at its facility upon request after grievance meetings." [DE 19-1 p. 15]. Seven years is a sufficient period of time to establish a practice, *see Prime Healthcare*, 357 N.L.R.B. No. 63, at *10 (finding that a 9-month long practice of permitting sick leave to accrue became a binding condition of employment), and since the ALJ found that DCX had permitted Mr. Altman access to the break room following a grievance every single time he asked, the practice occurred with sufficient regularity that the Board could reasonably conclude that it became a term and condition of employment.

DCX argues that a past practice cannot create a term or condition of employment here because the Union's access to DCX's facilities was expressly addressed in the CBA. Citing to cases involving disputes over collective bargaining agreements, DCX argues that past practices can only be considered where there are ambiguities or gaps in the CBA as to a particular issue, and that where the CBA is clear and unambiguous, past practices that differ from the CBA cannot create binding terms and conditions of employment. *Anheuser-Busch, Inc. v. Local Union No. 744*, 280 F.3d 1133 (7th Cir. 2004). DCX did not cite any case in which the Board applied this principal, but even assuming it applies here, it would not compel a different outcome, since the CBA does contain an ambiguity on this point. The CBA states that an "International representative of the Union shall be granted admission in the facility during work hours after his request has been granted by the senior manager." [DE 17-5 p. 26]. This provision is silent as to under what circumstances the senior manager shall grant the permission, so even under DCX's

argument, the past practices could be considered in filling that gap and determining that one such circumstance is after monthly grievance meetings.

Since there is a reasonable probability that the Director will prevail in establishing that this past practice constituted a term and condition of employment, the next question is whether denying Mr. Altman access to the break room on this particular occasion was a material, substantial, and significant change, such that DCX violated its duty to bargain by making the change unilaterally. The Board's decision in *Frontier Hotel & Casino*, on which the ALJ relied, strongly supports the Director's position on this issue. There, the employer implemented a policy limiting access to its facility that was only applicable to union representatives, and the policy "actually resulted in denying employee access to the representatives on the day the restriction was imposed." 323 N.L.R.B. at 818. Noting that "[a]ny change that actually interferes with contractually agreed employee access to the unit collective-bargaining representatives for representational purposes is a material change," the Board found that it was improper for the employer to have denied access to the officials on that occasion. *Id.*

Both of those factors were present here as well, as Mr. Altman was prevented from meeting with employees on this occasion, and Mr. Pettit's reason for denying access was, at least in part, specific to the union, as he did not want Mr. Altman discussing matters with the employees that might cause them to engage in speculation about the change in ownership. The fact that Mr. Altman was only denied access on one occasion is not dispositive. *See id.*; *Cherry Hill Textiles, Inc.*, 309 N.L.R.B. 268, 271 (1992) (finding an unfair labor practice where the employer denied the union access to the employer's facility on one occasion). Therefore, the Court finds that there is a reasonable probability that the Director will find this change to be

material, substantial, and significant, in which case DCX will have committed an unfair labor practice, so the Director has satisfied his burden at this element.

The equitable factors also favor the Director. Denying access to the break room would hamper the union's ability to engage with the employees, which could diminish the Union's ability to maintain support among its members. *See Spurlino*, 546 F.3d at 501; *Electro-Voice*, 83 F.3d at 1573. Given the successorship context and DCX's current refusal to bargain with the Union, the Union's access to bargaining unit employees is particularly important at this time to allow the Union to restore the support of its members. Like the $100 bonuses, the harm from further violations would not be fully repairable by the time the Board finally issues its decision, since while the Board can order DCX to bargain with the Union, it cannot order employees to restore their support for the Union. Meanwhile, DCX has not identified any type of harm it would suffer from permitting Mr. Altman to access its break room following the monthly grievance meetings, so the balance of harms also favors the Director. And finally, the public interest favors an injunction, as a diminution of support for the Union would impair the collective bargaining process. Therefore, the Court grants the Director's request for an injunction in this respect, and will enter an injunction requiring DCX to permit a Union official access to the employee break room for reasonable periods following the parties' monthly grievance meetings.

## E.     Stating that Stuart Manufacturing Would Be Non-Union

Finally, the Director argues that DCX committed an unfair labor practice when Ms. Goods-North stated that DCX would operate under the collective bargaining agreement but that Stuart Manufacturing, which was planning to operate at DCX's facility, would be non-union. The Director asserts that this statement violated section 8(a)(1) of the Act because it had a reasonable tendency to interfere with, restrain, or coerce employees in the exercise of their right

to unionize. The Court need not address the merits of this argument, however, though they are not particularly strong, because the Director has failed to establish any possibility of irreparable harm absent an injunction.

Ms. Goods-North's statement that Stuart Manufacturing would be non-union was an isolated statement even under the Director's version of events. In addition, since the time of that statement, Stuart Manufacturing has not reopened, nor does there appear to be any plan for it to do so. [*See* DE 19-1 p. 15 ("[T]he relationship between [DCX] and Tobin soured . . . . [DCX] accordingly stopped allowing Tobin access to the facility unless he obtained permission in advance, and any discussions about Stuart Manufacturing leasing [DCX's] equipment or facility space came to a halt."); DE 17-1 p. 18–23, 40–41]. To the contrary, the parties appear closer to litigation than to forming an amicable business relationship, and with little prospect of Stuart Manufacturing restarting its operations, there is no reason to believe Ms. Goods-North will have occasion to make such a statement again or that such a statement would be perceived as threatening. [DE 17-1 p. 40; *see* DE 19-1 p. 14 (noting, in finding the statement to be an improper threat, that "[t]he context for Goods-North's statement is significant," and that her statement could have had a threatening effect "[i]n light of the close connection between [DCX] and Stuart Manufacturing at the time (i.e., before the relationship went sour)")]. Thus, the Court concludes that the Director has failed to establish any possibility of irreparable harm, so the Court denies the Director's request for injunctive relief as to this issue.

## IV.  CONCLUSION

The Regional Director's petition for a temporary injunction is GRANTED in part and DENIED in part. The Court ENJOINS the Respondent, SMI/Division of DCX-Chol Enterprises, Inc. ("DCX"), as follows:

1.      DCX shall recognize and, upon request, bargain in good faith with the Union as the exclusive collective-bargaining representative of the bargaining unit employees, until at least six months after the date of the first bargaining meeting between the Union and DCX;

2.      Upon a request from the bargaining unit employees, through the Union, made within 30 days of this Order, DCX shall restore the employees' pay dates to every other Wednesday, and shall not thereafter change the pay dates without first bargaining with the Union;

3.      DCX shall refrain from giving awards to bargaining unit employees for meeting production standards, including but not limited to awarding a $100 bill to each employee, without first bargaining with the Union over such awards;

4.      Upon a request from the Union, DCX shall permit an official from the Union access to the employee break room at its Fort Wayne facility for reasonable periods following the parties' monthly grievance meetings;

5.      DCX shall post a copy of this order at its 1615 East Wallace Street, Fort Wayne, Indiana facility at all locations where notices to employees customarily are posted, and shall maintain said postings, free from all obstructions and defacements, during the pendency of the Board's administrative proceedings; and

6.      DCX shall file a sworn affidavit of compliance with this Order within 45 days of this Order.

This injunction shall terminate once the National Labor Relations Board has rendered a final decision in this matter.

SO ORDERED.

ENTERED:  November 7, 2014

                         _____/s/ JON E. DEGUILIO_____
                         Judge
                         United States District Court